# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

TONY COLAGIOVANNI,

          Plaintiff,

  v.

CH2M HILL, INC.,

          Defendant.

Case No. 2:13-CV-01508-APG-GWF

**ORDER GRANTING SUMMARY JUDGMENT**

(DKT. #26)

      Plaintiff Tony Colagiovanni was employed by Defendant CH2M HILL, Inc. and he participated in a retirement plan governed by the Employee Retirement Income Security Act ("ERISA"). CH2M terminated Colagiovanni's employment a little over a month before some of his ERISA benefits vested. Colagiovanni filed this lawsuit alleging an ERISA violation, defamation based on comments made by a CH2M employee, contract claims based on CH2M's Business Conduct Agreement, and tortious retaliatory discharge following Colagiovanni's report of abusive behavior by one of his co-workers. CH2M moves for summary judgment on each of Colagiovanni's claims.

## I. BACKGROUND

      In May 2008, CH2M offered Colagiovanni the position of Vice President of Southwest Transportation and Construction, Management Lead. (Dkt. #26-2 at 37-38.) Colagiovanni accepted the offer. (*Id.* at 41.) Upon entering into employment with CH2M, Colagiovanni read and signed various documents, including CH2M's Business Conduct Agreement. (Dkt. #26-1 at 9; Dkt. #26-2 at 47.) The Business Conduct Agreement states:

> I understand that CH2M HILL asks all employees to agree to and abide by the firm's rules of business conduct. These rules are intended to support and promote CH2M HILL's principles as well as to protect its employees, client relationships, financial integrity, public image, and shareholder value. In consideration of my employment with CH2M HILL, I agree to abide by these important and sustaining rules of conduct[.]

(Dkt. #26-2 at 45.)  The Business Conduct Agreement directed employees to "report any actual or suspected violations of the Business Conduct Policy," and "employees who report violations will be protected against any form of reprisal or retaliation." (*Id.* at 47.)

Colagiovanni also signed the CH2M Employee Administration Agreement. (*Id.* at 49, 55.) That agreement provided:

> My employment with CH2M HILL is not subject to a contract of employment restricting the parties' freedom to end the employment relationship, is of an indefinite duration, and is in all respects terminable 'at will.'  This means that I, or CH2M HILL, may at any time, with or without cause, with or without notice, for any lawful reason or for no reason at all, and with or without procedural formality, end my employment.  The 'at will' nature of the relationship cannot be changed except in writing, signed by both me and two designated officials of CH2M HILL. . . .  I understand that commitments to the contrary (either written or verbal) made by any other individuals are not authorized, cannot be relied upon by me, and are void.

(*Id.* at 50.)  The Employee Administration Agreement further provided that Colagiovanni "acknowledge[s] and agree[s] that [his] offer letter package from CH2M HILL, the company's Business Conduct Agreement, Employee Handbook and Policies and Procedures Manual, and this Employee Administration Agreement are likewise not 'contracts of employment' that change the 'at will' relationship." (*Id.* at 51.)

In March 2011, Colagiovanni was at dinner with Mike Leeper, Vice President of 4Leaf Consulting's Las Vegas office. (Dkt. #26-1 at 42-43, 65.)  During the dinner, Leeper received text messages from one of Colagiovanni's co-workers, Ken Gilbreth. (Dkt. #26-1 at 42-43; Dkt. #26-3 at 6-7.)  Gilbreth texted Leeper messages stating Colagiovanni had "fucked" Gilbreth over and to "[b]e aware." (Dkt. #26-3 at 6-7; Dkt. #27-4 at 9.)  Leeper showed the text messages to Colagiovanni. (Dkt. #26-1 at 44.)  Colagiovanni took a picture of the texts on Leeper's phone and emailed the picture to Kimberly Freeman in CH2M's human resources department. (*Id.* at 34, 45.) Colagiovanni thereafter attended a meeting with Freeman, Gilbreth, and Colagiovanni's then-supervisor, Bardia Nezhati. (*Id.* at 51.)  Colagiovanni and Gilbreth were directed to try to get along and work together, and the meeting ended with them shaking hands. (*Id.*)  Colagiovanni

was dissatisfied with the meeting because he felt nothing was done to address Gilbreth's conduct. (*Id.* at 52; Dkt. #27-1 at 3.)

Colagiovanni supervised Mel Johnson. (Dkt. #26-1 at 15-16, 19.)  In addition to working for CH2M, Johnson owned a company called CEEC, Inc. (*Id.* at 16.)  CEEC was a disadvantaged business enterprise ("DBE"). (*Id.* at 17.)  Leeper had requested Johnson's company to be a subcontractor for 4Leaf's proposal for the airport connector project, which required a DBE. (*Id.* at 16-17.)  CH2M also was a subcontractor for 4Leaf on the airport connector project. (*Id.* at 17.)

Johnson asked Colagiovanni whether it would be acceptable for her company to bid on the project for 4Leaf. (*Id.* at 18.)  Colagiovanni inquired whether her company would be doing only the DBE portion of the contract, and Johnson indicated that was correct. (*Id.*)  Colagiovanni was concerned about a potential conflict of interest if Johnson worked for both CH2M and CEEC on the same project. (*Id.* at 18-19.)  However, he told Johnson that so long as (1) her company performed only the DBE work, (2) she personally did not work on the airport connector project for CEEC, (3) she did not work for CH2M on the airport connector project, and (4) she did not perform any work for her company during CH2M work hours, it would be acceptable for her company to bid on the project. (*Id.* at 18, 26.)

About a week or two later, Gilbreth asked whether Colagiovanni was aware that Johnson's company was part of the proposal on the airport connector project. (*Id.* at 19.) Colagiovanni stated he was and he asked whether Gilbreth saw an issue with the situation. (*Id.*) Gilbreth responded that he did not have a problem with it. (*Id.*)  Colagiovanni did not report to his supervisor Nezhati that Johnson's company was part of the proposal on the airport connector project. (*Id.* at 22.)

Colagiovanni avers that despite the earlier meeting to resolve their differences, Gilbreth started harassing and disparaging him again, which continued until at least January 24, 2013. (Dkt. #27-1 at 3; Dkt. #27-3 at 4.)  Colagiovanni reported the problem and a meeting was set for April 25, 2013. (Dkt. #27-1 at 3; Dkt. #26-1 at 30.)

Before that meeting took place, Gilbreth attended a pre-proposal meeting for contractors on the Las Vegas Wash project. (Dkt. #26-1 at 83-84.)  Johnson appeared at the meeting on behalf of her own company. (*Id.*)  According to Gilbreth, City of Las Vegas personnel approached him after the meeting and asked if Johnson still worked for CH2M. (*Id.*)  When Gilbreth responded that she did, the City employees stated that posed a problem. (*Id.*)  The next day, Gilbreth advised Nezhati about what happened at this meeting. (*Id.* at 85.)

Upon receiving this information, Nezhati reported it to Colagiovanni's then-supervisor, Jeffrey Mack, and to Freeman in human resources. (Dkt. #26-2 at 6-7; Dkt. #26-4 at 2.)  In response, Johnson, her husband and co-employee Mike Johnson, and Colagiovanni were put on administrative leave while CH2M investigated. (Dkt. #26-2 at 8-9.)

Mack called Colagiovanni and asked him if he knew about Johnson's company. (Dkt. #26-2 at 21.)  Colagiovanni responded, "doesn't everybody?" (*Id.*)  Mack asked what he meant by that statement, and Colagiovanni said "I've got companies, I've got side businesses." (*Id.*)  Mack responded that he was surprised because it was not typical to have a side business unless that business engaged in activity completely different than CH2M. (*Id.* at 21-22.)  Mack told Colagiovanni that the legal and ethics departments at CH2M would have to be consulted. (*Id.*)  Following an investigation conducted by Freeman and another CH2M employee, CH2M decided to terminate Colagiovanni's employment. (*Id.* at 25-27.)  The decision to terminate was a joint decision of Mack and fellow CH2M employees Kathy Pileggi, Shawn Rodda, and Terry Ruhl. (*Id.* at 25, 27.)  Mack informed Nezhati about the decision after it was made. (*Id.* at 28.)  Nezhati agreed with the decision. (*Id.* at 10.)

On April 29, 2013, Colagiovanni met with Mack, Freeman, and Nezhati and was told he could resign or the company was going to terminate him for cause. (Dkt. #26-1 at 24-25.)  Colagiovanni refused to resign, and he was provided a termination letter. (*Id.*)

The termination letter discussed the conflict of interest posed by Johnson's business and that Colagiovanni admitted he made the decision that her side business did not pose a conflict of

1    interest on his own without checking with his supervisor. (Dkt. #26-3 at 2.)  According to the

2    letter, this decision:

3              was, and is incorrect, and has placed the company in a difficult and embarrassing
               situation with the client.  The fact that there is a readily apparently conflict of
4              interest associated with Ms. Johnson's ownership/operation of CEEC, Inc. while
               also being a CH2M HILL employee is problematic, at best.  You should have
5              recognized the inherent conflict of interest and raised the issue to Bardia Nezhati,
               your supervisor at the time of the Airport Connector Phase 1 proposal in June 2011
6              or to [Mack], when CEEC, Inc.'s services began in January of 2012.

7    (*Id.* at 3.)  The termination letter also referenced Colagiovanni's "failure to inform CH2M HILL

8    at the time of your hire and, more significantly when asked in your April 24 interview, that you

9    have multiple active business licenses (GC Consulting, LLC and Arizona Civil Constructors

10   LLC) and one permanently revoked business license (T&M Engineering and Consulting LLC)."

11   (*Id.*)  The letter indicated Colagiovanni exercised "poor judgment," "conducted [himself] in a

12   manner inconsistent with CH2M HILL's core values of integrity and trust," and was "less than

13   forthright . . . during the course of this investigation." (*Id.*)  CH2M therefore terminated

14   Colagiovanni's "at-will employment effective immediately." (*Id.*)

15            Following the investigation, Johnson was permitted to choose whether to dissolve her

16   company and remain a CH2M employee or to resign, and she resigned. (Dkt. #27-1 at 4.)  Mike

17   Johnson was not terminated or disciplined. (Dkt. #27-18 at 6.)

18            Colagiovanni participated in CH2M's 401(k) plan. (Dkt. #26-4 at 5.)  Under this plan,

19   employee contributions vested immediately while employer contributions were subject to a 5-year

20   vesting schedule. (*Id.* at 6.)  At the time Colagiovanni was terminated, 80% of the employer

21   contributions in his account had vested. (*Id.*)  The remaining 20%, amounting to approximately

22   $11,651.69, would have vested in June 2013. (*Id.*)  CH2M also provided stock option and stock

23   purchase plans which, according to CH2M's filings with the Securities and Exchange

24   Commission, are not subject to ERISA. (Dkt. #26-3 at 54, 59.)

25            Colagiovanni filed suit against CH2M asserting the company terminated him with the

26   prohibited purpose of preventing his ERISA benefits from vesting. (Dkt. #1.)  Colagiovanni later

27   amended his complaint to add claims that (1) CH2M, through Gilbreth, defamed him by sending

28

the March 2011 text messages to Leeper; (2) CH2M breached the Business Conduct Agreement and the covenant of good faith and fair dealing by terminating him in retaliation for his reports of Gilbreth's misconduct; and (3) CH2M tortiously discharged him for reporting Gilbreth's misconduct.  CH2M moves for summary judgment on each of these claims.

**II.  DISCUSSION**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions, and affidavits demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).  I must view the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

**A.  ERISA Violation - Count One**

Colagiovanni contends he was terminated to prevent his ERISA benefits from vesting in the 401(k) and stock purchase plans.  CH2M argues there is no evidence his participation in the plans factored into the termination decision.  CH2M also contends the stock purchase plan is not governed by ERISA.  Colagiovanni responds that the timing of his termination combined with evidence of pretext for the reasons for his termination raise genuine issues of fact that he was terminated to prevent his benefits from vesting.  Colagiovanni argues the true reason for his termination was that Gilbreth and Nezhati did not like him, had been looking for a reason to fire

him, and were trying to avoid the scheduled meeting to discuss Gilbreth's behavior. Colagiovanni contends Gilbreth and Nezhati's dislike of him led Nezhati to terminate him in a way that would hurt him financially.

"Section 510 of ERISA, 29 U.S.C. § 1140, prohibits an employer from terminating an employee in order to prevent the vesting of pension rights." *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 457-58 (9th Cir. 1995). When, as here, the plaintiff has no direct evidence of discrimination, courts use the *McDonnell Douglas*[1] burden shifting framework. *Lessard v. Applied Risk Mgmt.*, 307 F.3d 1020, 1025 (9th Cir. 2002). Under that framework, the plaintiff must set forth a prima facie case that the employer discriminated against him. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). The burden then shifts to the defendant to establish a legitimate, nondiscriminatory reason for the action taken. *Id.* at 253. If the defendant does so, the burden shifts back to the plaintiff to show that the proffered reason is pretext for discrimination. *Id.*

To establish a prima facie case of interference with the exercise of ERISA rights, the plaintiff must show (1) he participated in statutorily protected activity, (2) he suffered a statutorily prohibited action, and (3) a causal relationship between the two. *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 881 (9th Cir. 1989). Additionally, the denial of ERISA benefits must be the "motivating force" behind the statutorily prohibited action. *Id.* (stating the defendant must have acted with "specific intent to interfere with the rights under an employer's benefits plan in violation of ERISA." (quoting *Baker v. Kaiser Aluminum & Chemical Corp.*, 608 F. Supp. 1315, 1318 (N.D. Cal. 1984)). "[N]o action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination." *Dytrt v. Mountain States Tel. & Tel. Co.*, 921 F.2d 889, 896 (9th Cir. 1990) (holding no genuine issue of material fact to support the claim that denial of ERISA benefits was a motivating factor for employer's decision where the only evidence the plaintiff presented was the fact that her pension benefits would have been higher).

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Here, even assuming Colagiovanni presented a prima facie case, CH2M has proffered a legitimate, non-discriminatory reason for his termination.  CH2M concluded Colagiovanni exhibited poor judgment and failed to follow company procedures by approving Mel Johnson's company to work on the airport connector project and by not reporting this potential conflict of interest to a supervisor.

The burden shifted to Colagiovanni to present evidence raising a genuine issue of material fact that this proffered reason was pretext for CH2M's specific intent to deny him ERISA benefits.  Colagiovanni has not met that burden.  Mack and Nezhati state under oath that the reasons for Colagiovanni's termination were as stated in the termination letter and ERISA benefits played no part in the decision. (Dkt. #26-2 at 29; Dkt. #26-4 at 2, 49.)  Colagiovanni can point to no testimony or documentary evidence supporting his assertion that denial of ERISA benefits motivated the decision. (Dkt. #26-1 at 32-33.)  Colagiovanni speculates that the reason he was terminated was that Gilbreth and Nezhati disliked him and wanted to hurt him financially. (*Id.* at 29-30.)  However, there is no evidence Gilbreth had any input in the termination decision. And Nezhati was informed of the decision after it had already been made by Mack, Pileggi, Rodda, and Ruhl.  Colagiovanni presents no evidence Mack, Pileggi, Rodda, or Rule intended to financially harm him or that they knew about his participation in an ERISA plan.

Moreover, even if Nezhati played a substantial role in the decision, Colagiovanni presented no evidence beyond his own speculation that Nezhati was motivated by the specific intent to deny ERISA benefits.  When asked at his deposition why he thought Nezhati knew Colagiovanni's employer contributions would vest soon, Colagiovanni speculated that because Nezhati started employment with CH2M at approximately the same time he did, Nezhati would have vested around the same time. (*Id.* at 30-31.)  However, Nezhati avers he never participated in the 401(k) plan, he did not know the schedule for vesting of employer contributions, and he had no knowledge of when Colagiovanni's benefits would vest. (Dkt. #26-4 at 48-49.) Colagiovanni presents no evidence to the contrary.

Colagiovanni also relies on the timing of his termination and the disparate treatment Mel and Mike Johnson received in terms of discipline. As to timing, Colagiovanni presents no evidence that any decision maker knew when his benefits would vest. As to the disparate treatment, Colagiovanni presents no evidence that, to the extent there was disparate treatment, it was motivated by CH2M's specific intent to deny ERISA benefits. No reasonable jury could find in Colagiovanni's favor based on his unsupported speculation. I therefore grant CH2M's motion for summary judgment on this claim.

**B. Defamation - Count Two**

In the amended complaint, Colagiovanni alleges the March 2011 texts from Gilbreth to Leeper were defamatory. CH2M argues this claim is time-barred. In response, Colagiovanni asserts that Gilbreth continued to defame him until at least January 2013, thus tolling the limitations period. In reply, CH2M contends this theory does not apply where, as here, a single incident can be identified as the cause of the alleged injury. CH2M also argues neither the amended complaint nor Colagiovanni's deposition testimony identified any other defamatory statements.

Colagiovanni's defamation claim is governed by a two-year limitations period. Nev. Rev. Stat. § 11.190(4)(c). When a tort involves continuing wrongful conduct, the statute of limitations does not begin to run until the conduct ends. *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002). A continuing tort exists when no single incident fairly or realistically can be identified as the cause of significant harm to the plaintiff. *Id.*

Colagiovanni filed the amended complaint alleging defamation on April 21, 2014. (Dkt. #24.) The amended complaint identified only the March 2011 text messages as the defamatory communications. (*Id.* at 3.) Colagiovanni testified he was aware of the texts in March 2011. Because more than two years passed between the time Colagiovanni became aware of the allegedly defamatory statements and the time he filed the amended complaint, his defamation claim based on the March 2011 texts is time-barred.

1    The continuing tort doctrine does not apply in this context.  The amended complaint

2    identified a single incident from which Colagiovanni's injury arose.  In response to the summary

3    judgment motion, Colagiovanni vaguely references a continuing pattern of harassment and

4    disparaging comments, but he identifies only one other allegedly defamatory statement. (Dkt.

5    #27-1 at 3; Dkt. #27-3 at 4.)  Colagiovanni attaches to his response to the summary judgment

6    motion a January 24, 2013 email in which Colagiovanni stated that he had filled a table of 10

7    people for an event. (Dkt. #27-3 at 4.)  Gilbreth responded, "Seriously.  Do you have that many

8    friends." (*Id.*)  This single email does not establish a continuing tort to toll the limitations period

9    for the March 2011 text messages.  Colagiovanni's defamation claim based on the March 2011

10   text messages is time-barred.

11   The January 24, 2013 email was not identified in the amended complaint as a defamatory

12   statement, and the amended complaint does not suggest that any other statements beyond the

13   March 2011 texts were at issue.  Colagiovanni has never requested leave to amend to add

14   allegations of any other defamatory statement.  However, "[a]n addition of new issues during the

15   pendency of a summary judgment motion can be treated as a motion for leave to amend the

16   complaint." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994).  Whether to grant leave to

17   amend lies within the district court's discretion. *Id.*  Courts will deny leave to amend if: (1) it will

18   cause undue delay; (2) it will cause undue prejudice to the opposing party; (3) the request is made

19   in bad faith; (4) the party has repeatedly failed to cure deficiencies; or (5) the amendment would

20   be futile. *Id.*

21   I deny leave to amend to add a defamation claim based on the January 2013 email.  I find

22   no bad faith and it is unclear if amendment would be futile because the parties do not address the

23   viability of a defamation claim based on this email.  However, this email pre-dated the amended

24   complaint and thus could have been included in that pleading.  Colagiovanni amended the

25   original complaint specifically to include a defamation claim and he therefore should have added

26   his defamation claim based on the January 2013 email at that time.  Adding the claim now, after

27   discovery has closed and in response to a summary judgment motion, would prejudice CH2M and

28

1   unduly delay resolution of this case.  I therefore deny amendment and grant defendants' motion

2   for summary judgment on Colagiovanni's defamation claim.

3   **C. Contract Claims - Counts Three and Four**

4   The amended complaint alleges the Business Conduct Agreement was a contract between

5   the parties and CH2M breached that contract and the implied covenant of good faith and fair

6   dealing by terminating Colagiovanni in retaliation for reporting Gilbreth's misconduct.  CH2M

7   argues the parties had an at-will employment relationship that cannot support contract-based

8   claims.  Colagiovanni responds that the Business Conduct Agreement placed limitations on

9   CH2M's ability to fire him in retaliation for reporting another employee's violations of the

10   Business Conduct Agreement.

11   In Nevada, an employment contract presumptively is terminable at will. *Martin v. Sears,*

12   *Roebuck & Co.*, 899 P.2d 551, 554 (Nev. 1995); *D'Angelo v. Gardner*, 819 P.2d 206, 211 (Nev.

13   1991).  Although employment generally is at-will, "an employer may expressly or impliedly

14   agree with an employee that employment is to be for an indefinite term and may be terminated

15   only for cause or only in accordance with established policies or procedures." *D'Angelo*, 819 P.2d

16   at 211; *see also Martin*, 899 P.2d at 554.  An employer's issuance of an employee handbook

17   containing termination provisions of which the employee is aware may support an inference that

18   the handbook's termination provisions are part of the employment contract. *D'Angelo*, 819 P.2d

19   at 209.  An employer may avoid creating this inference by including in the handbook express

20   language that the employer does not intend to create contractual liability based on the handbook's

21   provisions. *Id.* at 209 n.4; *Martin*, 899 P.2d at 554-55.  Whether an employment contract exists is

22   an objective inquiry, and "an employee's subjective expectations are legally insufficient to

23   transform an at-will employment relationship into a contract of termination only for just cause."

24   *Bally's Grand Emps.' Fed. Credit Union v. Wallen*, 779 P.2d 956, 957 (Nev. 1989).

25   Colagiovanni bases his contract claims on the Business Conduct Agreement.  However,

26   on the same day Colagiovanni signed the Business Conduct Agreement, he also signed the

27   Employee Administration Agreement.  That document stated the employment relationship was at

28

will.  Colagiovanni acknowledged that the offer letter package, the Business Conduct Agreement, the Employee Handbook and Policies and Procedures Manual, and the Employee Administration Agreement are not contracts and do not change the at-will employment relationship. (Dkt. #26-2 at 51.)  These disclaimers negate any inference that CH2M intended to alter the presumptively at-will relationship with Colagiovanni.  I therefore grant CH2M's motion for summary judgment on Colagiovanni's contract-based claims.

### D. Tortious Discharge - Count Five

Colagiovanni alleges CH2M tortiously discharged him for reporting another employee's violation of CH2M's Business Conduct Policy.  CH2M argues there is no evidence Colagiovanni reported misconduct to an outside authority as is required to support this claim.  Additionally, CH2M argues there is no causal link between Colagiovanni's complaint to human resources regarding the March 2011 emails and his termination over two years later.  Colagiovanni responds that he was terminated in response to his reports that Gilbreth violated the Business Conduct Policy, Nevada anti-defamation law, and a general policy against retaliation. Colagiovanni argues that report to an outside entity should not be required.

Although Nevada law allows an employer to fire an at-will employee for any reason or for no reason at all, Nevada recognizes an exception for a discharge in violation of public policy. *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 885 (Nev. 1999) (en banc). Where an employer terminates an employee in violation of public policy, the terminated employee may bring a cause of action for tortious discharge. *Id.*  Being fired for reporting an employer's alleged illegal activity may support a tortious discharge claim. *Wiltsie v. Baby Grand Corp.*, 774 P.2d 432, 433 (Nev. 1989).  However, the employee must report the employer's allegedly illegal activity to the appropriate authorities outside of the company. *Id.*  Where an employee "report[s] the activity to his supervisor rather than the appropriate authorities," the employee is "merely acting in a private or proprietary manner" and is not eligible for whistleblower protection. *Id.* at 433-34.

1     Here, even assuming reports of Gilbreth's conduct would rise to the level of

2  whistleblowing to support a tortious discharge claim, Colagiovanni presents no evidence raising

3  an issue of fact that he reported Gilbreth's behavior to an outside authority.  Under Nevada law,

4  reports to a supervisor within the company are insufficient and, consequently, Colagioanni's

5  reliance on law from other jurisdictions is misplaced.  I therefore grant CH2M's motion for

6  summary judgment on Colagiovanni's tortious discharge claim.

7  **III.  CONCLUSION**

8     IT IS THEREFORE ORDERED that defendant CH2M HILL, Inc.'s motion for summary

9  judgment (Dkt. #26) is GRANTED.  The clerk of court is directed to enter judgment in favor of

10  defendant CH2M HILL, Inc. and against plaintiff Tony Colagiovanni.

11     DATED this 20th day of March, 2015.

12

13                                                            
                                                    ANDREW P. GORDON
14                                                  UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28